UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| CORY LIGUORE, | Case No. 24-cv-01621-LB |
| Plaintiff, | **ORDER ADDRESSING MOTION FOR DEFAULT JUDGMENT AND PROCEDURAL POSTURE OF THE CASE** |
| v. | |
| KENDALL SIMMONS, et al., | Re: ECF No. 15 |
| Defendants. | |

**INTRODUCTION**

In early 2018, the plaintiff posted intimate videos to Fuzz, an online dating app. Defendant Kendall Simmons allegedly took screenshots of the videos and used them and the plaintiff's name and personal information to set up a website to impersonate the plaintiff. The plaintiff sued the defendant and his company 7+6 Management, LLC, for cyberpiracy in violation of federal and California law and harassment, exploitation, negligent and intentional infliction of emotional distress, and unfair competition in violation of California law. The defendants did not appear, and after the clerk's entry of default, the plaintiff moved for default judgment on all claims, asking for statutory, compensatory, and punitive damages totaling $408,299.50, attorney's fees of $23,885, a permanent injunction, and transfer of the domain name. Then, at the August 29, 2024, hearing on the motion, the defendant appeared (and had been emailing the clerk's office regularly for some months previously to ask when the case was calendared). The court issues this order to flag legal

issues that attend the pending motion: the law regarding default and default judgments, personal jurisdiction, the viability of certain claims, damages, and the status of the corporation and the attendant issues under *Williams v. King*, which requires that all parties, even non-appearing defendants, consent to the undersigned's jurisdiction. 875 F.3d 500, 503–05 (9th Cir. 2017).

## STATEMENT

### 1. Allegations in the Complaint and Declarations About Damages

The plaintiff is Corey Liguore, and he lives in Pleasanton, California.[1] He had an account on a now-defunct videochat and dating application called Fuzz, where he livestreamed to public audiences or to private individuals by invitation only. He also owned and used an educational YouTube channel under his real name.[2] Defendant Kendall Simmons resides in Illinois. He has a company called 7+6 Management, LLC, but "the company either does not truly exist (at least not as an Illinois or Delaware LCC), or if it does exist, then it has profited from Mr. Simmons'[s] activities. . . ." Mr. Simmons allegedly appropriated the plaintiff's intimate photos from Fuzz and took the plaintiff's resume information from LinkedIn and the YouTube channel and, without the plaintiff's consent, impersonated the plaintiff (by using the plaintiff's name in the domain name coryliguore.com) and posted the photos publicly. As a result, the plaintiff's employer fired him.[3]

The following is a fuller account of the relevant events as recounted in the complaint.

The parties became acquainted in 2018. In early 2018, the plaintiff used the app Fuzz to livestream to public audiences and, by invitation, to individuals. Fuzz "was described and purportedly was designed to be a secure application on which no media or information could be recorded or saved to users' personal devices."[4] In the summer of 2018, Mr. Simmons contacted the plaintiff through Fuzz's private-chat function, asking about whether he could be the plaintiff's

---

[1] Compl. – ECF No. 1 at 2 (¶ 1). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 2 (¶ 2), 4 (¶¶ 10–12).

[3] *Id.* at 2–3 (¶¶ 3–4).

[4] *Id.* at 4 (¶ 10).

United States District Court
Northern District of California

roommate. The plaintiff refused because they were strangers. Despite that rejection, Mr. Simmons demanded the plaintiff's personal cell number. "In response and fear of further uncomfortable requests," the plaintiff "ceased any private communications with the Defendant."[5]

This marked the beginning of a campaign of online harassment.[6] Using the username @yfroggy13, Mr. Simmons left public comments on the plaintiff's YouTube channel — a channel where the plaintiff posted career-coaching videos directed to audiences who wanted to improve their work skills and gain financial freedom — that referenced public and private content that the plaintiff posted on the Fuzz app.[7] In November 2018, the plaintiff deleted his YouTube channel and created a new one "to avoid the Defendant finding the new account." He also blocked Mr. Simmons's "two known Instagram accounts from seeing or accessing any content from [the plaintiff's] personal Instagram account."[8]

On October 21, 2023, Mr. Simmons and 7+6 Management, LLC "registered the domain name <coryliguore.com> and published on the domain a website containing information from [the plaintiff's] resume and intimate content that was screenshot or screen recorded from his long-inactive Fuzz application profile, without [the plaintiff's] knowledge or consent. The website represents [the plaintiff] as the publisher and host of the domain name, which was and is false." The meta description provided in the search results of [the plaintiff's] name started by producing the results 'Cory Liguore slut.'"[9]

On November 13, 2023, the plaintiff's employer fired him, citing "the content displayed on the domain name <coreyliguore.com> as the reason for his termination." This was the first time the plaintiff learned about the domain name and its content. The domain "appeared as the first online

---

[5] *Id.* (¶ 11).

[6] *Id.* at 4–7 (¶ 11–27).

[7] *Id.* at 4 (¶ 14).

[8] *Id.* at 5 (¶ 15).

[9] *Id.* (¶ 16).

information when any person searched Microsoft Bing for [the plaintiff's] name and as the fourth online listing when any person searched his name on Google."[10]

The plaintiff filed a police report on November 16, 2023, with the Pleasanton police department.[11] On November 18, he contacted Google to remove the domain name and website from search results relating to his name. Google removed the website from the search results.[12] On November 28, at the behest of the police, the domain registrar and webhost (Wix.com) took the website down and ceased domain services.[13]

On December 6, 2023, in response to a police warrant, Wix.com identified the owner and creator of the domain <coryliguore.com> as "Kendell Simmons, from Villa Park, Illinois."[14] "On December 20, 2023, the Defendants launched another website, publishing more information than had been published previously from [the plaintiff's] resume, publishing the same intimate screenshot content from [the plaintiff's] long-ago deleted Fuzz account, and publishing accessible links to all of [the plaintiff's] personal social media accounts."[15] On December 21, a sergeant from the Villa Park police department was assigned to the case. "However, information revealed later than the defendant Simmons did not live in Villa Park Police Department jurisdiction," and so the case was reassigned to the DuPage County Sheriff's Office.[16] The authorities in Illinois "were not willing to pursue any criminal investigation or charges, and consequently the criminal cases were all closed."[17]

On January 9, 2024, the plaintiff filed a request with Microsoft Bing to remove the domain website from search results relating to his name. Microsoft removed the website from the Bing search results.[18] On January 8, 2024, the plaintiff "went to the District Attorney to meet Inspector

---

[10] *Id.* (¶ 17).

[11] *Id.* (¶ 18).

[12] *Id.* at 5–6 (¶ 19).

[13] *Id.* at 6 (¶ 20).

[14] *Id.* (¶ 21) (uppercase omitted).

[15] *Id.* (¶ 22).

[16] *Id.* (¶ 23).

[17] *Id.* (¶ 24).

[18] *Id.* at 7 (¶ 25).

United States District Court
Northern District of California

United States District Court
Northern District of California

Cassandra Pickett and plead for help to get Police Departments to pursue charges for the alleged crimes committed against him."[19] In January 2024, the plaintiff changed and updated his social-media accounts and user names, including Facebook, Instagram, and Twitter "so as not to be connected to any websites operated by the Defendants. However, the Defendants persisted in finding and publishing [his] updated social media accounts and usernames on the Domain and associated website. The Defendants added [the plaintiff's] updated resume information and statements pertaining to [his] current search for new employment and shared that information on the website as well."[20] On January 31, 2024, following Inspector Pickett's suggestion, the plaintiff filed a complaint with the FBI, which has not responded."[21]

In his supporting declaration, the plaintiff confirms Mr. Simmons's online harassment of him: the plaintiff had a Fuzz account in early 2018, it was supposed to be secure and anonymous, Mr. Simmons contacted him in the summer of 2018 about being his roommate, and he declined and blocked Mr. Simmons, who thereafter left comments on the plaintiff's career-advice YouTube channel referencing the intimate content on Fuzz and then set up the unauthorized websites (twice) with the intimate content.[22]

The plaintiff submitted documents showing how he identified Mr. Simmons as the creator of the two <coryliguore.com> websites and more information about what Mr. Simmons published on the sites. A WHOIS record shows that Mr. Simmons — listing the Villa Park address (above) and phone number 415-949-6022 — registered the domain name on October 20, 2023.[23] Mr. Simmons then published information from the plaintiff's resume and Fuzz account. [24] A screenshot shows the website from a Google search result with the metatag "Cory Liguore slut" in the first line of the

---

[19] Id. (¶ 26).

[20] Id. (¶ 27).

[21] Id. (¶ 28).

[22] Liguore Decl. – ECF No. 15-2 at 1–2 (¶¶ 1–6), 3 (¶ 13).

[23] Id. at 2 (¶ 4), 3 (¶ 12); WHOIS Record, Ex. A to id. – ECF No. 15-3.

[24] Liguore Decl. - ECF No. 15-2 at 2 (¶ 5).

search result.[25] Other screenshots have the words "Cory" and "blog" and has the plaintiff's images, thus suggesting that it is his website. They also list "kendallsimmons" as the author of the posted content.[26] The bottom of the website "indicated that it was owned by Defendant 7+6 Management LLC."[27] On December 20, 2023, the defendants launched the second website with information from the plaintiff's resume, content from the Fuzz account, and links to the plaintiff's social-media accounts.[28] The plaintiff confirms the complaint's allegations about his successful efforts to remove the domain and websites from search results related to his name and his changing his social-media accounts and usernames "so as not to be connected to any websites operated by the Defendants."[29] But the defendants "persisted in finding [him] and again published [his] updated social media accounts and usernames on the Domain and associated website. [They] added [his] personal resume information and statements pertaining to [his] then current search for new employment."[30] "As of late March 2024, after [the] Complaint was filed and served on Defendants, the infringing website was taken down by Defendants."[31]

The plaintiff also confirms the complaint's allegations about his attempts to enlist the assistance of law enforcement: he filed a police report with the Pleasanton police department, which convinced the domain registrar to take down the first website, and he tried to pursue criminal charges in California and Illinois.[32]

The plaintiff provided additional information about his damages. On November 13, 2024, he "was given notice of termination by his employer, who cited the content displayed on the domain name <coryliguore.com> as the reason for his termination." This was the first time the plaintiff

---

[25] Screenshot, Ex. B to *id.* – ECF No. 15-4 at 2.

[26] Screen Shot, Ex. B to *id.* – ECF No. 15-4 at 3–5.

[27] Liguore Decl. – ECF No. 15-2 at 2 (¶ 6).

[28] *Id.* at 3 (¶ 10); Screenshots, Ex. E to *id.* – ECF No. 15-7.

[29] Liguore Decl. – ECF No. 15-2 at 3 (¶ 10), 4 (¶¶ 15–16); Emails to Google, Ex. D to *id.* – ECF No. 15-6; Letter to Microsoft, Ex. F to *id.* – ECF No. 15-8.

[30] Liguore Decl. – ECF No. 15-2 at 4 (¶ 17).

[31] *Id.* (¶ 18).

[32] *Id.* at 3–4 (¶¶ 9, 11–12, 14), 3

United States District Court
Northern District of California

learned of the domain name and its content. He lost monthly income of $12,083, and he was unable to obtain a job until May 2024, despite over one hundred and forty job applications during that time. He received unemployment benefits of $450 for six weeks totaling $2,700.[33] He spent twenty-six hours researching the identity of the defendants, communicating with law-enforcement agents, containing third-party domain-name registrars, calling mental-health support lines, and collaborating with his counsel. At his $68.65 hourly rate from his old employment, this amounts to $1,784.90.[34]

## 2. Procedural History

On March 15, 2024, the plaintiff filed a seven-count complaint: (1) cyberpiracy, in violation of 15 U.S.C. § 8131(1)(A); (2) cyberpiracy, in violation of Cal. Bus. Prof. Code § 17525; (3) civil harassment, in violation of Cal. Civ. Code § 1708.7; (4) disorderly conduct/cyber exploitation, in violation of Cal. Penal Code § 647; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; and (7) unlawful business practices, in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq.[35] He asks for injunctive relief, transfer of the domain name, compensatory and punitive damages, and his attorney's fees (referencing his entitlement to costs under Cal. Civ. Proc § 1021.5 via the UCL claim).

The plaintiff personally served Mr. Simmons on March 19, 2024, at 1S175 Michigan Avenue, Villa Park, IL 60181.[36] After the defendants did not appear, the Clerk of Court entered their default.[37] The plaintiff moved for default judgment on June 5, 2024, and noticed the motion for a hearing on July 11, 2024, at 9:30 a.m. The court continued the hearing several times to July 18, August 11, August 15, and August 29.[38] Mr. Simmons appeared at the August 29, 2024, hearing. The court learned then that he had emailed the clerk's office on at least five dates to confirm the

---

[33] *Id.* at 2–3 (¶ 7).

[34] *Id.* at 4 (¶ 19).

[35] *Id.* at 7–12 (¶¶ 30–70).

[36] Proof of Serv. – ECF No. 8-1.

[37] Entry of Default – ECF No.

[38] Mot. – ECF No. 15; *see* Dkt.

United States District Court
Northern District of California

hearing dates: June 13, July 11, July 18, August 15, and August 29. In his last email, he cc'd someone named Paula Erickson (presumably an attorney), said that she had sent an email to the plaintiff's counsel in April 2024, said that the email was ignored, and offered to provide the email.

## JURISDICTION, VENUE, AND SERVICE

Before entering default judgment, a court must determine whether it has subject-matter jurisdiction over the action and personal jurisdiction over the defendant. *In re Tuli*, 172 F.3d 707, (¶712 (9th Cir. 1999). A court must also ensure the adequacy of service on the defendant. *Timbuktu Educ. v. Alkaraween Islamic Bookstore*, No. C 06–03025 JSW, 2007 WL 1544790, at *2 (N.D. Cal. May 25, 2007).

First, the court has federal-question subject-matter jurisdiction under the federal statute and supplemental jurisdiction over the state claims. 28 U.S.C. §§ 1331(a) & 1367(a). Even without federal-question jurisdiction, the parties are diverse, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1).

Second, the plaintiff served the defendants personally, which resulted in the defendants' taking down the website (a fact that confirms service). Mr. Simmons appeared on August 29, 2029.

Third, the plaintiff did not address personal jurisdiction. The issue also implicates venue: venue exists (1) in a judicial district where the defendant resides, (2) in a judicial district where "a substantial part of the events or omissions giving rise to the claim occurred," or (3) if there is no district under (1) and (2), in any judicial district where the defendant "is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b).[39] In a tort case, there is specific personal jurisdiction if the defendant (1) commits an intentional act (2) expressly aimed at the forum (3) that causes harm that the defendant knows is likely to be suffered in the forum. *Washington Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F.3d 668, 672–73 (9th Cir. 2012) (the "effects" test "focuses on the forum in which the defendant's actions were felt, whether or not the

---

[39] The plaintiff relies on (2): a substantial part of the events or omissions that gave rise to the claims occurred in the Northern District. Compl. – ECF No. 1 at 4 (¶ 9).

actions themselves occurred within the forum") (cleaned up), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017); *Calder v. Jones*, 465 U.S. 783, 788–90 (1984) (articulating the "effects" test); *Impossible Foods, Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023) (when a defendant's tortious conduct takes place primarily outside the forum state, the Ninth Circuit generally applies the purposeful-direction "effects" test and "look[s] to whether the defendant expressly aimed acts at the forum state knowing that they would harm the plaintiff there"), *cert. denied*, 2024 WL 2262336 (U.S. May 20, 2024) (No. 23-874).

As discussed at the hearing, the plaintiff must provide more information about personal jurisdiction and venue and may do so in a supplemental brief and declaration instead of filing a new standalone motion. The complaint references Mr. Simmons's posting of resume information: presumably the plaintiff can be more explicit about how the defendants knew that their tortious conduct would affect the plaintiff here. Another option is that the court can transfer the case to the district where the defendant resides. Again, this can be addressed in the supplemental brief.

The order next addresses issues about setting aside default and the merits of the default-judgment motion.

## ANALYSIS

Under Federal Rule of Civil Procedure 55(b)(2), a plaintiff may apply to the district court for — and the court may grant — a default judgment against a defendant who failed to plead or otherwise defend an action. After entry of default, well-pleaded allegations in the complaint regarding liability and entry of default are taken as true except as to damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). The court need not make detailed findings of fact. *Id.* "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

"A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (cleaned up). The decision to grant or deny a default judgment lies within the court's discretion. *Draper v.*

*Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986). The next sections address (1) the standard for setting aside a default and (2) the factors that apply to decisions to enter a default judgment.

### 1. Standard for Setting Aside Entry of Default

Under Rule 55(c), a court may set aside an entry of default for "good cause." *United States v. Signed Personal Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010). To determine whether a defendant has shown good cause to justify vacating entry of default, a court considers three factors: (1) whether the defendant engaged in culpable conduct that led to the default; (2) whether the defendant lacked a meritorious defense; and (3) whether reopening the default would prejudice the plaintiff. *Id.* This standard is disjunctive, meaning the court may deny the request to vacate default if any of the three factors is true. *Id.* "Crucially, however, judgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits." *Id.* (cleaned up).

The standard to set aside an entry of default is the same standard used to determine whether a default judgment should be set aside under Federal Rule of Civil Procedure 60(b), except that in the Rule 55(c) context, courts have greater discretion and can apply the standard more liberally to grant relief from entry of default because there is no interest in the finality of a judgment. *Id.* at 1091 n.1; *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001); *Hawaii Carpenters' Tr. Fund v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986); *Mendoza v. Wight Vineyard Mgmt.*, 783 F.2d 941, 945 (9th Cir. 1986). When considering whether to vacate entry of default under Rule 55(c), the court's "underlying concern . . . is to determine whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *Hawaii Carpenters' Tr. Fund*, 794 F.2d at 513. The inquiry "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Brandt*, 653 F.3d at 1111 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Ass'n Ltd.*, 507 U.S. 380, 395 (1993)). The decision ultimately lies in the discretion of the court. *Id.* at 1111–12.

As the party seeking to set aside entry of default, a defendant bears the burden of showing good cause under this test. *Hawaii Carpenters' Tr. Fund*, 794 F.2d at 513–14. To ensure that cases

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   are decided on the merits whenever possible, the court resolves any doubt regarding whether to

2   grant relief in favor of vacating default. *O'Connor v. Nevada*, 27 F.3d 357, 364 (9th Cir. 1994).

3       The following is an analysis of the three factors relevant to the determination of whether a

4   defendant has shown cause to justify vacating entry of default.

5       **1.1 Culpability**

6       The first issue under Rule 55(c) is "whether [the defendant] engaged in culpable conduct that

7   led to the default." *Mesle*, 615 F.3d at 1091. "[A] defendant's conduct is culpable if he has

8   received actual or constructive notice of the filing of the action and *intentionally* failed to answer"

9   or otherwise defend the action. *Id.* at 1092; Fed. R. Civ. P. 55(a). From this point, the analysis

10  divides into two streams.

11      Where a party is not represented by counsel, and is itself legally unsophisticated, its default is

12  intentional only if it "acted with bad faith." *Mesle*, 615 F.3d at 1092. Bad faith would include an

13  "intention to take advantage of the opposing party, interfere with judicial decision making, or

14  otherwise manipulate the legal process." *Id.* The Ninth Circuit has "typically held" that a

15  defendant's conduct was culpable under this inquiry where the defendant's conduct can be

16  explained only as a "devious, deliberate, willful, or bad faith failure to respond." *Id.*

17      Culpability under Rule 55(c) is more readily found where the defaulting defendant was legally

18  sophisticated or was represented by counsel. *See id.* at 1093. There is then no need to show that

19  the defendant acted in bad faith. *Id.* "When considering a legally sophisticated party's culpability

20  in a default, an understanding of the consequences of its actions may be assumed, and with it,

21  intentionality." *Id.* With notice of the lawsuit, in other words, a represented party who defaults is

22  culpable under Rule 55(c). *Id.*

23      Here, Mr. Simmons is not represented by counsel. He now has agreed to defend the case.

24      The court can choose to set aside a default. "A district court may exercise its discretion to deny

25  relief to a defaulting defendant based solely upon a finding of defendant's culpability, but need

26  not." *Brandt*, 653 F.3d at 1112. The Ninth Circuit has explained that, even where a defendant has

27  acted culpably in defaulting, a court deciding a Rule 55(c) motion must consider all three factors

28  (culpability, meritorious defense, and prejudice), "taking account of all relevant circumstances

United States District Court
Northern District of California

surrounding the party's omission," in view of the law's strong preference for trying cases on their merits. *See id.* at 1111–12.

While Mr. Simmons should have responded to the complaint, he also is representing himself, and he is defending the case now. He also apparently communicated with the plaintiff's counsel in April. These facts probably do not show the requisite "intention to take advantage of the opposing party, interfere with judicial decision making, or otherwise manipulate the legal process" or a "devious, deliberate, willful, or bad faith failure to respond." *Mesle*, 615 F.3d at 1092.

### 1.2 Meritorious defense

With respect to whether the defendant lacked a meritorious defense, a defendant must allege "specific facts" that, if true, would constitute a defense. *Mesle*, 615 F.3d at 1094. The burden on the defendant is "not extraordinarily heavy." *Id.* "A mere general denial without facts to support it is not enough to justify vacating a default or default judgment." *Franchise Holdings II LLC v. Huntington Rest. Grp., Inc.*, 375 F.3d 922, 926 (9th Cir. 2004) (cleaned up).

The court separately issued an order sending Mr. Simmons the handbook for self-represented litigants and the flyer so that he can call the court's Legal Help Center. That should improve his ability to defend his case.

### 1.3 Unfair prejudice

The final factor is prejudice to the plaintiff. Prejudice is more than "simply delaying the resolution of the case" and instead is whether the plaintiff's "ability to pursue his claims will be hindered." *TCI*, 244 F.3d at 701 (cleaned up). "[T]he delay must result in tangible harm such as a loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *Id.* By contrast, merely requiring a plaintiff to litigate the merits of a case is not prejudice under the third prong. *Id.* As the Ninth Circuit has held, "A default judgment gives the plaintiff somewhat of a windfall by sparing her from litigating the merits of her claim because of her opponent's failure to respond; vacating the default merely restores the parties to an even footing in the litigation." *Id.*

Also, courts, "whenever possible," must try cases on their merits, and the court's final obligation is to consider "all relevant circumstances" and then do equity. *Mesle*, 615 F.3d at 1091 (merits); *Brandt*, 653 F.3d at 1111 (equity); *Pioneer Inv.*, 507 U.S. at 395 (same); *Eitel v. McCool*,

782 F.2d 1470, 1472 (9th Cir. 1986) (default judgments generally are disfavored because "[c]ases should be decided on their merits whenever reasonably possible"). Indeed, under the *Eitel* factors, default judgment is not appropriate for reasons that include the possible dispute about (at least some) material facts, fear (which may not be excusable neglect but provides some context) and "the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." 782 F.2d at 1471–72.

\*       \*       \*

The court asks the parties to confer about whether they might stipulate to set aside the clerk's entry of default. If the parties do not stipulate, Mr. Simmons may move to set aside the entry of default.

The next section addresses issues that the court has identified with the current motion. Some are surmountable and others may not be. The issues may be moot if the default is set aside, but they may provide helpful context for any motion to dismiss. Also, as discussed below, corporations cannot proceed pro se, and so the entry of default remains a live issue there.)

### 2.   Factors for Default Judgment

In deciding whether to enter a default judgment, the court considers seven factors: (1) [T]he possibility of prejudice to the plaintiff; (2) the merits of [the] plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72. "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Mohanna v. Bank of Am., N.A.*, No. 16-cv-01033-HSG, 2017 WL 976015, at \*3 (N.D. Cal. Mar. 14, 2017) (cleaned up). Here, the *Eitel* factors generally favor default judgment for some claims (with some provisos).

### 2.1   The Possibility of Prejudice to the Plaintiffs (First Eitel Factor)

The first *Eitel* factor considers whether the plaintiff would suffer prejudice if the court does not enter default judgment, and whether such potential prejudice to him weighs in favor of granting a

1    default judgment. *Eitel*, 782 F.2d at 1471; *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d

2    1039, 1054 (N.D. Cal. 2010). Without a judgment, the plaintiff has no remedy. This factor favors

3    default judgment.

4    **2.2   The Merits and Sufficiency of the Claims (Second and Third Eitel Factors)**

5        The second and third *Eitel* factors consider the merits of the claims and the sufficiency of the

6    complaint. 782 F.2d at 1471. "The Ninth Circuit has suggested that [these factors] . . . require that

7    plaintiffs' allegations state a claim on which the [plaintiff] may recover." *Kloepping v. Fireman's*

8    *Fund*, No. C 94-2684 TEH, 1996 U.S. Dist. LEXIS 1786, 1996 WL 75314, at *2 (N.D. Cal. Feb.

9    13, 1996) (*quoting Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)).

10       The plaintiff seeks default judgment on all claims: (1) cyberpiracy, in violation of 15 U.S.C. §

11   8131(1)(A); (2) cyberpiracy, in violation of Cal. Bus. Prof. Code § 17525; (3) civil harassment, in

12   violation of Cal. Civ. Code § 1708.7; (4) disorderly conduct/cyber exploitation, in violation of Cal.

13   Penal Code § 647; (5) intentional infliction of emotional distress; (6) negligent infliction of

14   emotional distress; and (7) unlawful business practices, in violation of the UCL.[40]

15       **2.2.1   Cyberpiracy — 15 U.S.C. § 8131(1)(A) (Claim One)**

16   15 U.S.C. § 8131(1)(A), titled Cyberpiracy protections for individuals, provides for civil liability:

17       Any person who registers a domain name that consists of the name of another
         living person, or a name substantially and confusingly similar, thereto, without that
18       person's consent, with the specific intent to profit from such name by selling the
         domain name for financial gain to that person or any third party, shall be liable in a
19       civil action by such person.

20   The statute authorizes a court to "award injunctive relief, including the forfeiture or

21   cancellation of the domain name or the transfer of the domain name to the plaintiff" and, "in its

22   discretion, [to] award costs and attorneys fees to the prevailing party." *Id.* § 8131(2).

23       The plaintiff must "demonstrate that the defendant (1) registered a domain name that consists

24   of the name of the [plaintiff], (2) did so without the [plaintiff's] consent, and (3) had the specific

25   intent to profit from the [plaintiff's] name by selling the domain name for financial gain." *Bogoni*

26   *v. Gomez*, 847 F. Supp. 2d 519, 523 (S.D.N.Y. 2012) (citing 15 U.S.C. § 8131(1)(A)). The

27

28   _____
     [40] Mot. – ECF No. 15 at 12–21.

United States District Court
Northern District of California

1    plaintiff has established the first two elements. The issue is whether he demonstrated the

2    defendants' specific intent to profit from the sale of the domain names. The complaint alleges that

3    the defendants "intentionally targeted the Plaintiff so as to gain financial benefit from the sale of

4    the Domain to the Plaintiff and/or to otherwise financially benefit themselves."[41] After entry of

5    default, well-pleaded allegations in the complaint regarding liability and entry of default are taken

6    as true except as to damages. *Combs*, 285 F.3d at 906. But the defendants' alleged harassing and

7    destructive conduct affected only the plaintiff's financial wellbeing and does not establish the

8    defendants' specific intent to profit.

9        In *Bogoni*, a case that involved "one in a series of domestic disputes between" the parties, a

10   "prominent philanthropist" sued a registrant of domain names with his first and last names

11   (paulbogoni.org and paulbogoni.com). The sites had two art pieces that purportedly would be put up

12   for public auction: an airplane constructed by the defendant bearing the painted word "Bogoni" and

13   an angel constructed by her three-year-old daughter, the purported owner of the sites. 847 F. Supp.

14   2d at 521, 536. At the end, the web page concluded that the daughter would sell the domain names

15   for $1 million each. *Id.* at 521–22. Because the defendant had purchased both domain names for less

16   than $20 and within several days offered to sell them at an exorbitant price, the court held that the

17   plaintiff specifically intended to profit by the sale of the websites. *Id.* at 524–25; *see id.* at 525–26

18   (because the art pieces were not posted for sale until one month after the plaintiff filed the

19   complaint, the defendant did not meet the statute's good-faith exception to liability).

20       In reaching its conclusion, the *Bogoni* court analyzed the scant case law interpreting the

21   statutory term "specific intent to profit." *Id.* at 523. For example, a district court in the Eastern

22   District of Virginia concluded that the plaintiff did not allege a violation by alleging that the

23   "defendants intended . . . that the plaintiff pay them money to settle an alleged debt." On appeal,

24   the Fourth Circuit affirmed. *Id.* at 523–24 (citing and quoting *Carl v. Bernardjcarl.com*, 662 F.

25   Supp. 2d 487, 497–98 (E.D. Va. 2009) (addressing 15 U.S.C. § 1129, later transferred to 15

26   U.S.C. § 8131), *aff'd*, 409 F. App'x 628, 630 (4th Cir. 2010)). In the Middle District of Florida, a

27

28   ───────────────────
     [41] Compl. – ECF No. 1 at 8 (¶ 34).

1  district court reached the opposite conclusion on similar facts. *Id.* at 524 (citing *Salle v. Meadows*,

2  No. 07 Civ. 1089, 2007 WL 4463920, at *2 (M.D. Fla. Dec. 17, 2007) ("specific intent to profit"

3  established by registering a domain name to recover a debt from the plaintiff)). An Eastern District

4  of Pennsylvania case also involved an offer for sale of the domain name, thus satisfying the

5  element. *Id.* (citing *Schmidheiny v. Weber*, 285 F. Supp. 2d 613, 628 (E.D. Pa. 2003))

6     This case has no fact allegations that approximate those in the cases cited in *Bogoni*. The

7  court's modest research has not revealed other cases that address the issue. On this record, the

8  second and third *Eitel* factors do not favor default judgment on the federal cyberpiracy claim.

9        **2.2.2    Cyberpiracy — Cal. Bus. & Prof. Code § 17525 (Claim Two)**

10     Under Cal. Bus. & Prof. Code § 17525(a)(1),

11          It is unlawful for a person, with a bad faith intent, to register, traffic in, or use a
          domain or subdomain name that is identical or confusingly similar to, because of,

12          among other things, misspelling of the domain or subdomain name, either of the
          following:

13               (1) The personal name of another living person or decreased personality,

14               without regard to the goods or services of the parties. . . .

15     "A person who registers, traffics in, or uses a domain or subdomain name" in violation of this

16  provision without consent "is presumed to have done so with a bad faith intent. This presumption

17  s21-01388-CJC (KESx), 2022 WL 19571620, at * (C.D. Cal. Oct. 24, 2022) (this section means

18  that to defeat a summary-judgment motion, a defendant "has the burden to present evidence of his

19  good faith intent"). In determining whether there is a bad-faith intent, the court considers a list of

20  non-exhaustive "factors, including, but not limited to, the following:

21          (a) The trademark or other intellectual property rights of the person alleged to be in
          violation of this article, if any, in the domain name.

22
          (b) The extent to which the domain name consists of the legal name of the person
23          alleged to be in violation of this article or a name that is otherwise commonly used
          to identify that person.

24
          (c) The prior use, if any, by the person alleged to be in violation of this article of
25          the domain name in connection with the bona fide offering of any goods or
          services.

26
          (d) The legitimate noncommercial or fair use of the name in an internet website
27          accessible under the domain name by the person alleged to be in violation of this
          article.

28

(e) The intent of a person alleged to be in violation of this article to do either of the following:

(1) Divert consumers from the person's or deceased personality's online location to a site accessible under the domain name that could harm the goodwill represented by the person's or deceased personality's name either for commercial gain or with the intent to tarnish or disparage the person's or deceased personality's name by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

(2) Divert consumers from the online location of an entity described in paragraph (2) of subdivision (a) of Section 17525 to a site accessible under the domain name that could harm the goodwill represented by that entity's name either for commercial gain or with the intent to tarnish or disparage the entity by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

(f) The offer by a person alleged to be in violation of this article to transfer, sell, or otherwise assign the domain name to the rightful owner or any third party for substantial consideration without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services.

(g) The intentional provision by the person alleged to be in violation of this article of material and misleading false contact information when applying for the registration of the domain name.

(h) The registration or acquisition by the person alleged to be in violation of this article of multiple domain names that are identical or confusingly similar to names described in subdivision (a) of Section 17525.

(i) Whether the person alleged to be in violation of this article sought or obtained consent from the rightful owner to register, traffic in, or use the domain name.

(j) The intent of a person alleged to be in violation of this article to mislead, deceive, or defraud users of the internet website, including consumers and voters.

Cal. Bus. & Prof. Code § 17526; *see Supinsky*, 2022 WL 19571620, at *2.

The plaintiffs rely on subsections (b), (e)(1), and (i).[42] The facts seemingly satisfy those elements. That said, the plaintiff cites no cases evaluating similar facts. There are cases addressing the claim. *Graupner v. Oakes*, No. La CV20-07004 Jak (Ex), 2020 WL 5441574, at *6–7 (C.D. Cal. Aug. 17, 2020) (defendants registered domain names that included the plaintiff's name and information intended to harm the plaintiff's reputation; the "plaintiffs have submitted evidence that the website is now being offered for sale;" denied TRO in favor of further briefing on motion for a preliminary injunction). The court's modest research reveals that courts consider all of the

---

[42] Mot. – ECF No. 15 at 13–14.

factors including — as they do in the federal context — unjust enrichment. *Id.* And if that comes at the plaintiff's expense, presumably there is a provable claim. That said, court have analyzed the bad-faith factors under Cal. Bus. & Prof. Code § 17526 and have recognized that they do not include 15 U.S.C. § 8131(1)(A)'s intent-to-profit requirement. *Cazorla v. Hughes*, No. CV 14-02112 MMM (CWx), 2014 WL 12235425, at *14–15 (C.D. Cal. Apr. 7, 2014).

Even assuming that the fact allegations are sufficient, some analysis of the case law — including citations to authority where the defendant has not profited — will be necessary if the case proceeds to default judgment.

### 2.2.3    Civil Harassment — Cal. Civ. Code § 1708.7 (Claim Three)

"A person is liable for the tort of stalking when the plaintiff proves all of the following elements of the tort:

(1) The defendant engaged in a pattern of conduct the intent of which was to follow, alarm, place under surveillance, or harass the plaintiff. In order to establish this element, the plaintiff shall be required to support his or her allegations with independent corroborating evidence.

(2) As a result of that pattern of conduct, either of the following occurred:

(A) The plaintiff reasonably feared for his or her safety, or the safety of an immediate family member.

(B) The plaintiff suffered substantial emotional distress, and the pattern of conduct would cause a reasonable person to suffer substantial emotional distress.

(3) One of the following:

(A) The defendant, as a part of the pattern of conduct specified in paragraph (1), made a credible threat with either (i) the intent to place the plaintiff in reasonable fear for his or her safety, or the safety of an immediate family member, or (ii) reckless disregard for the safety of the plaintiff or that of an immediate family member. In addition, the plaintiff must have, on at least one occasion, clearly and definitively demanded that the defendant cease and abate his or her pattern of conduct and the defendant persisted in his or her pattern of conduct unless exigent circumstances make the plaintiff's communication of the demand impractical or unsafe.

(B) The defendant violated a restraining order, including, but not limited to, any order issued pursuant to Section 527.6 of the Code of Civil Procedure, prohibiting any act described in subdivision (a).

Cal. Civ. Code § 1708.7. To state a claim for stalking under § 1708.7, "a plaintiff must allege that:

(1) [the] defendant engaged in a pattern of conduct the intent of which was to follow, alarm, or

United States District Court
Northern District of California

1    harass the plaintiff; (2) as a result [of] that pattern of conduct, [the] plaintiff reasonable feared for

2    his or her safety; and (3) [the] defendant either made a credible threat with intent to place the

3    plaintiff in reasonable fear or violated a restraining order"); *see Thunder Studios, Inc. v. Kazal*, 13

4    F.4th 736, 743 (9th Cir. 2021) ("Under California law, a defendant commits the tort of stalking by

5    'engaging in a pattern of conduct the intent of which was to follow, alarm, place under

6    surveillance, or harass the plaintiff;" "the pattern of conduct must lead the plaintiff to either

7    'reasonably fear' for his own safety or that of an immediate family member, or to 'suffer

8    substantial emotional distress' when a reasonable person would also suffer substantial emotional

9    distress") (quoting Cal. Civ. Code § 1708.7(a)(2)(A)) (cleaned up). The statute proscribes only

10   conduct that occurs in California. *Id.*

     The plaintiff alleges a pattern of conduct that harassed the plaintiff and resulted in the loss of

11   his job, which satisfies statutory element 1. The remaining elements are the statutory elements 2

12   (reasonable fear for safety or substantial emotional distress that would also be suffered by a

13   reasonable person) and 3 (credible threat). To support those factors, the plaintiff cites his loss of

14   his job and the hours he spent addressing the harassment.[43] But the complaint and the declaration

15   do not address the elements: a credible threat that placed him in reasonable fear for his safety or

16   substantial emotional distress that a reasonable person would suffer. *Tull v. Higgins*, No. 21-cv-

17   01566-DMR, 2021 WL 611971, at *15 (N.D. Cal. Dec. 27, 2021); *see also Bolton v. City of

18   Berkeley*, No. 19-cv-05212-WHO, 2019 WL 6250927, at *4 (N.D. Cal. Nov. 22, 2019) (the

19   plaintiff listed seven other encounters with the Berkeley police; "Most importantly, Bolton needs

20   to allege that officers made a credible threat towards him with the intent to place him in reasonable

21   fear. Simply listing the number of encounters with the officers is not enough."). Another issue is

22   that the plaintiff did not address whether the conduct occurred in California.

---

[43] *Id.* at 15 (citing Liguore Decl. – ECF No. 15-2 at 2–3 (¶ 7) (lost job), 4 (¶ 19) (twenty-six hours spent addressing the harm)).

*United States District Court*
*Northern District of California*

### 2.2.4    Disorderly Conduct — Cal. Penal Code § 647 (Claim Four)

In the default-judgment motion, the plaintiff does not defend the claim and instead says that this is a predicate act under California's Unfair Competition Law (UCL) and that he will dismiss the claim without prejudice if he receives the other relief he requests.[44] Given this argument, the court does not address the argument further (including whether it is a standalone claim, given the apparent lack of a civil right of action in the statute) because the plaintiff apparently eliminated this claim as a basis for default judgment.

### 2.2.5    Intentional Infliction of Emotional Distress (Claim Five)

In California, "[a] cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Kelley v. Conco Cos.*, 196 Cal. App. 4th 191, 215, (2011) (cleaned up). A defendant's conduct is outrageous when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (cleaned up). The plaintiff seemingly has plausibly pleaded intentional infliction of emotional distress. Still, if the case proceeds to default judgment, the plaintiff must provide a supplemental brief with some analysis, including (if possible) a case with similar facts.

### 2.2.6    Negligent Infliction of Emotional Distress (Claim Six)

Negligent infliction of emotional distress is a form of the tort of negligence and has the following elements: (1) duty, (2) breach of duty, (3) causation, and (4) damages. *Huggins v. Longs Drug Stores Cal., Inc.*, 6 Cal. 4th 124, 129 (1993); *see Burgess v. Super. Ct.*, 2 Cal. 4th 1064, 1072 (1992) (elements for negligent infliction of emotional distress include (1) the defendant engaged in negligent conduct involving the usual issues of duty and breach, (2) the plaintiff suffered serious emotional distress, and (3) the defendant's conduct was a substantial factor in causing the emotional distress suffered by plaintiff). A duty to the plaintiff may be "imposed by law, be

---

[44] *Id.* at 21.

United States District Court
Northern District of California

assumed by the defendant, or exist by virtue of a special relationship." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993) (*citing Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.,* 48 Cal. 3d 583, 590 (1989)).

Under California law, there is no duty to avoid negligently causing emotional distress to another. *Id.* at 984.

> [U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests.

*Id.* at 985. Therefore, a plaintiff must allege a duty owed to the plaintiff regarding his emotional condition or (relevantly here) allege that his emotional distress arises out of the defendant's breach of some other legal duty. *Brahmana v. Lembo*, No. C–09–00106 RMW, 2010 WL 290490, at *2 (N.D. Cal. Jan. 15, 2010). And in a case like this, which involves "direct victim" liability, there must be a duty "that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between" the parties. *Marlene*, 48 Cal. 3d at 590.

The plaintiff's claim of negligent infliction of emotional distress is predicated on a breach of the duty of care established by federal and state law for registering and operating domains.[45] The only potentially viable claim is cyberpiracy in violation of Cal. Bus. & Prof. Code § 17525(a)(1). The plaintiff cited only cases with the elements of the claim and provided no cases that predicate negligent infliction of emotional distress on a violation of a statute. In the supplemental brief, he must do so or eliminate the claim as a basis for default judgment.

### 2.2.7   Unfair Business Practices — Cal. Bus. & Prof. Code § 17200 (Claim Seven)

The UCL outlaws "any unlawful . . . business act or practice." *See* Cal. Bus. & Profs. Code § 17200. This "unlawful prong" of the UCL "incorporates other laws to make them actionable." *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1098 (N.D. Cal. 2010). "Generally, 'violation of almost any law may serve as a basis for a UCL claim.'" *Id.* (quoting in part *Plascencia v. Lending*

---

[45] *Id.* at 18.

*1st Mortg.*, 259 F.R.D. 437, 448 (N.D. Cal. 2009) (citing in turn *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)). The California cyberpiracy claim presumably is a "predicate unlawful act" under the UCL that damaged the plaintiff, but it might be prudent to provide a cite to a case where courts have considered a like statute as a UCL unlawful act.

*     *     *

Subject to the analysis in the supplemental brief, the second and third *Eitel* factors — the merits and sufficiency of the claims — favor default judgment for three claims: cyberpiracy in violation of Cal. Bus. & Prof. Code § 17525(a)(1), the UCL claim predicated on it, and intentional infliction of emotional distress. *Eitel*, 782 F.2d at 1471.

### 2.3  The Sum of Money at Stake (Fourth Eitel Factor)

The fourth *Eitel* factor considers the sum of money at stake in the action. Substantial or unreasonable monetary demands weigh against default judgment. 782 F.2d at 1472 (three-million-dollar judgment, considered in light of the parties' dispute as to material facts, supported decision to not enter default judgment); *Tragni v. S. Elec. Inc.*, No. 09-32 JF (RS), 2009 WL 3052635, at *5 (N.D. Cal. Sept. 22, 2009); *Bd. of Trs. v. RBS Wash. Blvd., LLC*, No. C 09-00660 WHA, 2010 WL 145097, at *3 (N.D. Cal. Jan. 8, 2010). When the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate. *Bd. of Trs. of the Sheet Metal Workers Health Care Plan of N. Cal. v. Superhall Mech., Inc*., No. C 10-2212 EMC, 2011 WL 2600898, at *2–3 (N.D. Cal. June 30, 2011).

As discussed in the Statement, the plaintiff seeks actual damages relating to his loss of employment and costs expended to address the harm. Subject to the analysis below about damages, this factor favors default judgment.

### 2.4  The Possibility of a Dispute or Excusable Neglect (Fifth and Sixth Eitel Factors)

The fifth and sixth *Eitel* factors consider the potential of factual disputes and whether a defendant's failure to respond was likely due to excusable neglect. *Eitel*, 782 F.2d at 1471–72. In *Eitel*, there was a factual dispute and excusable neglect. *Id.* at 1472. The *Eitel* defendant disputed material facts in the (untimely) answer and counterclaim. *Id.* Moreover, the defendant's response was late because the parties had previously agreed to "what appeared to be a final

*United States District Court*
*Northern District of California*

1    settlement agreement," and "[the defendant] reasonably believed that the litigation was at an

2    end." *Id.* Because his reliance was reasonable, and the defendant responded promptly when the

3    agreement dissolved, there was excusable neglect for the untimely response. *Id.*

4         No facts suggest excusable neglect here. These factors favor default judgment.

5    **2.5  The Strong Policy Favoring Decisions on the Merits (Seventh Eitel Factor)**

6         The seventh *Eitel* factor considers the strong policy under the Federal Rules of Civil Procedure

7    favoring decisions on the merits. *Eitel*, 782 F.2d at 1472. Although default judgment is disfavored,

8    "[t]he very fact that F.R.C.P. 55(b) exists shows that this preference, standing alone, is not

9    dispositive." *Kloepping*, 1996 WL 75314, at *3. "While the Federal Rules do favor decisions on

10   the merits, they also frequently permit termination of cases before the court reaches the merits[,] . .

11   . [as] when a party fails to defend against an action[.]" *Id.*

12        Litigation on the merits is not possible. This factor supports default judgment.

13                                    *        *        *

14        In sum, the *Eitel* factors likely favor default judgment for three claims: cyberpiracy in violation

15   of Cal. Bus. & Prof. Code § 17525(a)(1), the UCL claim predicated on it, and intentional infliction

16   of emotional distress. If the case proceeds to default judgment, the plaintiff must provide the

17   supplemental analysis discussed above.

18   **2.6  Relief Sought**

19        Under Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind

20   from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The purpose

21   of this rule is to ensure that a defendant is put on notice of the damages being sought against him

22   so that he may make a calculated decision about whether it is in his best interest to answer. *In re*

23   *Ferrell*, 539 F.3d 1186, 1192–93 (9th Cir. 2008) (rejecting requests for damages and fees because

24   the prayer for relief lacked the "requisite specificity to put defendants on notice that the [plaintiff]

25   sought attorneys' fees and costs on the default judgment*"); Bd. of Trustees of the Sheet Metal*

26   *Workers Local 104 Health Care Plan v. Total Air Balance Co., Inc*., No. 08-2038 SC, 2009 WL

27   1704677, at *4 (N.D. Cal. June 17, 2009) (defaulting defendant's due-process rights were not

28

United States District Court
Northern District of California

violated "because the defendant had been served with all of the papers justifying the pension fund's request and leading up to the final determination").

The complaint provides fair notice of the damages: the statutory damages, compensatory damages, punitive damages, and attorney's fees and costs.

"To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit." *Bd. of Trs. of the Laborers Health & Welfare Trust Fund for N. Cal. v. A&B Bldg. Maint. Co. Inc.*, No. C 13-00731 WHA, 2013 WL 5693728, at *4 (N.D. Cal. Oct. 17, 2013); *see Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2011 WL 3267714, at *2 (N.D. Cal. July 29, 2011) (requires admissible evidence, including witness testimony); *Bd. of Trs. of Bay Area Roofers Health & Welfare Trust Fund v. Westech Roofing*, 42 F. Supp. 3d 1220, 1232 n.13 (N.D. Cal. 2014) (the plaintiff has the burden to establish damages).

### 2.6.1    Compensatory Damages, Attorney's Fees, and Costs

The plaintiff seeks compensatory damages: (1) the loss of his $12,083 monthly income from November 13, 2023, to May 2024, (2) compensation for the 26 hours he spent addressing the harm (his hourly rate before termination of $68.65 times 26 is $1,784.90), and (3) his attorney's fees of $23,885. Cal. Bus. & Prof. Code § 17525(d) allows compensatory damages and attorney's fees:

> A party who has suffered injury in fact and has lost money or property as a result of a violation of this section may bring a civil action for recovery of actual, consequential, and punitive damages, if warranted, and shall be awarded reasonable attorney's fees if the action is resolved in that party's favor.

First, the plaintiff put in sufficient evidence that his employer fired him and he lost his monthly wage. He did not do the math. If the case proceeds to default judgment, he must submit a supplemental declaration showing the dates he was unemployed and the amount of money — despite 140 job applications — that he lost. Presumably this should be offset by the unemployment benefits. It would be useful to cite cases supporting the appropriateness of the award (especially given the plaintiff's obligation to cover). A related issue is that the complaint gives notice that the plaintiff lost his job and is seeking resulting damages. Courts have held that a complaint gives fair notice of damages even if they are not reduced to a specific number. For example, in ERISA actions involving collectively bargained employee-benefits plans, the collective-bargaining representative

and trustees of the plains sue employers for delinquent contributions. The complaints often identify damages by reference to specific time periods and seek damages for additional delinquent contributions through the date of judgment. Courts hold that the complaints give fair notice of the claimed damages. *See, e.g.*, *Board of Trustees of the Sheet Metal Workers Local 104 Health Care Plan v. Total Air Balance Co.*, No. 08-2038 SC, 2009 WL 1704677, at *3-5 (N.D. Cal. June 17, 2009); *Bay Area Painters v. Alta Specialty*, No. C06-06996 MJJ, 2008 WL 114931, at *4 (N.D. Cal. Jan. 10, 2008). That analysis seems appropriate here, but the plaintiff must address the legal issue in the supplemental brief before the court can enter default judgment.

Second, the plaintiff does not provide authority for recovering damages for the hours spent addressing the cyberprivacy or why the hourly rate from is job is the right measure for compensation. Also, the complaint does describe generally the work he undertook to address the problem. But it is not obvious that the damages — research, communicating with law enforcement, calling mental-health lines, and working with his lawyer — do "not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

Third, the plaintiff seeks his attorney's fees of $23,885. The statute allows them. Cal. Bus. & Prof. Code § 17525(d).

To determine a reasonable fee award, courts use the lodestar method by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). A reasonable hourly rate is that prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008); *Camacho*, 523 F.3d at 979. The relevant community is "the forum in which the district court sits," which is the Northern District of California in this case. *Camacho*, 523 F.3d at 979. The party requesting fees must produce satisfactory evidence — in addition to the attorney's own affidavits or declarations — that the rates are in line with community rates. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987).

United States District Court
Northern District of California

1    There is no declaration establishing the hourly rate, whether it is a reasonable rate), or the

2    reasonableness of the hours spent.[46] The plaintiff must submit a supplemental declaration before

3    the court can award fees.

4    Fourth, presumably the plaintiff seeks his costs for the filing fee and service. Under Civil

5    Local Rule 54-1, costs must be documented, supported by a declaration, necessarily incurred, and

6    allowable by law. *Nw. Adm'rs, Inc. v. Event Prods., Inc.*, No. C 08-3899-PJH, 2009 WL 1106812,

7    at *4 (N.D. Cal. Apr. 23, 2009) (awarding costs in a default judgment for filing and serving the

8    complaint); *cf. Wells Fargo Advisors, LLC v. Brayer*, No. 3:11-cv-06685-JSC, 2012 WL 2990779,

9    at *4 (N.D. Cal. July 12, 2012) (recommending denying costs without prejudice to submitting the

10   ordinary bill of costs because the plaintiff did not comply with Local Rule 54-1 in the submissions

11   in support of default judgment for the Rule 54(d) costs); *Rodgers v. Claim Jumper Rest., LLC*, No.

12   13-CV-5496 YGR, 2015 WL 1886708, at *14 (N.D. Cal. Apr. 24, 2015) (awarding costs without a

13   bill of costs because all substantive requirements to support the costs were already met). If the

14   plaintiff submits his costs, they can be awarded as part of the default judgment. Otherwise, he can

15   submit the ordinary bill of costs after judgment is entered in his favor.

### 2.6.2   Punitive Damages

17   Cal. Bus. & Prof. Code § 17525(d) allows "punitive damages, if warranted." "California Civil

18   Code § 3294(a) allows for the recovery of punitive damages only where a plaintiff shows the

19   defendant acted with malice, oppression, or fraud in connection with the tortious conduct at issue.

20   Under § 3294(b), malice is defined as either: (1) conduct which is intended by the defendant to

21   cause injury to the plaintiff or (2) 'despicable conduct which is carried on by the defendant with a

22   willful and conscious disregard of the rights or safety of others.'" *Rhynes v. Stryker Corp.*, No. 10-

23   5619 SC, 2011 WL 2149095, at *5 (N.D. Cal. May 31, 2011) (citing Cal. Civ. Code § 3294(b)).

24   "California courts have defined 'despicable conduct' as conduct which is 'so vile, base,

25   contemptible, miserable, wretched or loathsome that it would be looked down upon and despised

26   by ordinary people.'" *Id.* (quoting *Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306,

27

28   _____
     [46] *Id.* at 20 (offering to provide information via a declaration and time records).

United States District Court
Northern District of California

331 (1992)).

The facts alleged in the complaint (and supported by declaration) satisfy the statutory elements for malice. That said, the plaintiff did not cite any case authority for entitlement to punitive damage and cited only one case — *Hardeman v. Monsanto* — for the proposition that punitive damages in a 4:1 ratio are appropriate.[47] 997 F.3d 941, 975 (9th Cir. 2021); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005) ("In cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality."). Before the court can award punitive damages, the plaintiff must provide some analysis, preferably including a case awarding punitive damages with analogous facts and any case that has imposed punitive damages as part of a default judgment. Also, presumably only Mr. Simmons is subject to punitive damages.

### 2.6.3   Statutory Damages

There is no viable federal claim and thus no entitlement to statutory damages. If the plaintiff overcomes the "specific intent to profit" issue, then he must provide more analysis of his right to statutory damages because damages do not appear recoverable based on a plain reading of 15 U.S.C. § 8131. In a section titled "Civil Liability," the statute provides that a person who violates the statute "shall be liable in a civil action. . . ." 15 U.S.C. § 8131(1)(A). In a subsequent section titled "Remedies," it provides the following remedies: "In any civil action brought under paragraph (1), a court may award injunctive relief, including the forfeiture or cancellation of the domain name or the transfer of the domain name to the plaintiff." *Id.* § 8131(2). It is silent about damages, including statutory damages.

To support his argument for statutory damages, the plaintiff cites 15 U.S.C. § 1117(d) to support a claim for statutory damages:

> **(d) Statutory damages for violation of section 1125(d)(1).** In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages

---

[47] *Id.*

United States District Court
Northern District of California

and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

15 U.S.C. § 1125(d)(1) generally prohibits cyberprivacy of a trademark. The plaintiff does not provide the necessary steps to show entitlement to statutory damages: he just assumes it. He cites three cases, but they do not support the conclusion.

First, he quotes *Mirage Resorts v. Cybercom Prods.* "[i]n cases involving cyberpiracy […] section 1117(d) allows a plaintiff to elect statutory damages of an amount between $1000 and $100,000, to be determined by the court, per domain name pirated."[48] 228 F. Supp. 2d 1141, 1142 (D. Nev. 2002). *Mirage* is a cursory order addressing cyberpiracy in the context of trademark infringement case. *Id.* The omitted section references cyberprivacy in violation of § 1117(d):

> In cases involving cyberpiracy, violations of 15 U.S.C. § 1125(d)(1), section 1117(d) allows a plaintiff to elect statutory damages of an amount between $1000 and $100,000, to be determined by the court, per domain name pirated. Plaintiff's undisputed allegations establish cyberpiracy under section 1125(d)(1) and allow it the option under section 1117(d). The Court finds $100,000 to be a just award and grants statutory damages in that amount to Plaintiff.

*Id.* The case does not show entitlement to statutory damages for a violation of § 8131(1)(A).

Second, he cites *Lahoti v. Vericheck, Inc.* to support his request for statutory damages of $100,000 per domain "based on Defendant's bad faith efforts, deliberate and knowing acts, [and] pattern of abuse."[49] 708 F. Supp. 2d 1150, 1170 (W.D. Wash. 2010), *aff'd*, 636 F.3d 501 (9th Cir. 2011). *Lahoti* is a Lanham Act case. He cites *The City of Carlsbad v. Shah*, again to support his request for $100,000 per domain, but that case did not involve a violation of § 8131(1)(A) either.[50] 850 F. Supp. 2d 1087, 1108 (S.D. Cal. 2012).

The court did a fairly exhaustive search of the case law and found no cases awarding any damages under § 8131(1)(A): all cases had other statutory claims that authorized damages. The plain language of § 8131 supports the conclusion that it allows only injunctive relief and gives the

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

court discretion to award fees and costs for cases involving fraud, bad faith, or willful conduct (as opposed to fee awards under § 1125(d) for "exceptional" cases).

### 2.6.4    Injunctive Relief

The plaintiff asks for an injunction (1) preventing the defendants from any use of the plaintiff's name, likeness, or information in any domain names or websites and (2) requiring third-party registrars or web-hosting companies with control over the domain <coryliguore.com> to disable the domain and associated websites with the plaintiff's name, likeness, or intimate conduct.[51] Injunctive relief is available for a violation of Cal. Bus. & Prof. Code § 17525(a)(1):

> Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.
>
> . . .
>
> Actions for injunction under this section may be prosecuted by any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter.

Cal. Bus. & Prof. Code § 17525(a)(1),

"According to well-established principles of equity, a plaintiff seeing a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Michael Grecco Prods. v. 8 Decimal Capital Mgmt.*, No. 20-cv-07466-HSG (TSH), 2021 WL 2534567, at *6 (N.D. Cal. June 1, 2021) (cleaned up) (a copyright-infringement case) (*quoting eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)), *R. & R. adopted*, 2021 WL 2531093 (N.D. Cal. June 21, 2021).

---

[51] Compl., Prayer for Relief – ECF No. 1 at 13; Proposed J. – ECF No. 15-1 at 3–4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

"Generally, absent a great public injury, a permanent injunction will be granted when liability has been established and there is a threat of a continuing violation." *Id.* (cleaned up).

All four factors are met, and a permanent injunction is warranted. First, without a permanent injunction, the defendants may continue their conduct (as was shown by the second website that they put up after the first was taken down). That previously caused injury when the plaintiff's employer fired the plaintiff. Second, given that context, damages are not sufficient to compensate the plaintiff, who might have to bring new lawsuits for any new violation. Third, the balance of hardships also weighs in favor of an injunction, again because the defendants may continue their pattern of cyberprivacy. The defendants cannot claim legitimate hardship resulting from their cyberprivacy. *See id.* (making a similar observation in the context of willful copyright infringement). Finally, an injunction is in the public interest. *Id.* (an injunction was in the public interest because "the public receives a benefit when the legitimate rights of copyright holders are vindicated").

The scope of the injunction is not overbroad. *Cf. id.* at *7 (limiting scope to the Google photograph at issue). It also is appropriate, not only based on the use of the plaintiff's name and content, but also because of the resulting emotional distress. *See Conradis v. Buonocore*, 6:18-cv-1486-EJK, 2021 WL 424372, at *1, *6 (M.D. Fla. Sept. 17, 2021) (copyright-infringement case and related claims, including IIED, resulting from the wrongful obtaining of copyrighted photographs and subsequent extortion; "plaintiffs have provided evidence of their emotional distress, and if not enjoined, [the defendant] could continue to cause Plaintiffs irreparable injury that cannot be fully compensated by a monetary award").

That said, the court asks the plaintiff to look at the language in paragraph 2 of the proposed injunction against the defendants. The court understands the plaintiff's intent: prevent the use of the plaintiff's name in a domain name or website and then using the domain/website to publish content like the information at issue in the case. But technically, the language could be viewed as overbroad: it prohibits the use of the plaintiff's name or likeness in connection with any website. Slightly tweaking the words will address the issue.

### 3.   The Corporation as a Defendant

An issue (flagged in the Statement) is that the plaintiff apparently was unable to determine whether 7+6 Management, LLC exists. If it does, "[i]t is a longstanding rule that corporations and other unincorporated associations must appear in court through an attorney." *D-Beam Ltd. V. Roller Derby Skates, Inc.*, 366 F.3d 972, 973–74 (9th Cir. 2004) (cleaned up); N.D. Cal. Civ. L.R. 3-9(b). This might matter ultimately to the court's consent jurisdiction. The court cannot decide dispositive matters without all parties' consent to magistrate-judge jurisdiction. This applies to Mr. Simmons, who has appeared and has not yet consented to the court's jurisdiction. It also applies to non-appearing, defaulting parties, like the defendant corporation. *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017). It is premature to address the issue now: the deadline for Mr. Simmons to consent is September 12. But for perk value, there are three ways that this issue can be resolved.

First, a non-appearing defendant can appear and consent. But this is not possible if the non-appearing defendant is a corporation or other association that is unrepresented.

Second, if the corporation does not appear, the undersigned can retain jurisdiction over the case if it severs the plaintiff's claims against the defaulting defendant pursuant to Federal Rule of Civil Procedure 21. The severed defendant would be severed into a separate but related case that would be given a new case number. The new case would remain assigned to the undersigned. No additional filing fee would be required. The original case would move forward. With respect to the new case, any issues (such as any motion for default judgment) can be addressed after the original case concludes, either directly (if there is a dismissal) or by way of a report and recommendation that ultimately would be reviewed by a district judge.

Third, the court could reassign the entire case to a district judge.

The first step is to figure out if there is a real corporation. The court directs the parties to meet and confer about the status of the non-appearing corporation on the timeline set forth below.

### CONCLUSION

Before Mr. Simmons appeared, the court's intent was to flag the issues and have the plaintiff submit a supplemental brief to address the issues and a supplemental declaration to address the

United States District Court
Northern District of California

1    jurisdictional facts and the relatively simple math calculations. Now, Mr. Simmons has appeared,

2    and these are all live issues for any motion to dismiss.

3        Under the circumstances, the courts thinks that the next best steps are for the parties to submit

4    a statement by September 26, 2024, about (1) the status of the corporation, (2) whether the

5    plaintiff wants to keep the corporation in the case, (3) whether the plaintiff will stipulate to set

6    aside the entry of default and, if not, when the plaintiff will file a motion to set aside the default,

7    and (4) whether the plaintiff wants to proceed on the existing complaint with the viable claims that

8    the court has identified or instead wants to amend it. By that date, the plaintiff should submit a

9    declaration with the necessary jurisdictional facts to establish personal jurisdiction.

10       If the default judgment eventually goes forward (for example, against the corporation), the

11   court will need the supplemental brief referenced above and a revised proposed order/judgment. If

12   the plaintiff styles it instead as a new motion, he should rely on the existing declarations (and of

13   course may supplement them) so that the court does not have to redo its record cites.

14       The next date is the initial case-management conference on October 10, 2024, at 11:00 a.m.

15       **IT IS SO ORDERED.**

16       Dated: September 5, 2024

17                                              LAUREL BEELER
                                                United States Magistrate Judge
18

19

20

21

22

23

24

25

26

27

28